# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BARBARA BIGALKE,

      Plaintiff,

v.                                                               Case No. 05-C-29

NEENAH FOUNDRY CO.,

      Defendant.

## DECISION AND ORDER

Plaintiff Barbara Bigalke alleges she was discriminated against on the basis of her sex while working at the Neenah Foundary Company. Towards the end of her six month stint at the company, Bigalke became involved in a sexual affair on company time with a male employee. To make matters worse, the employee's wife was also employed at the company. The result, Bigalke claims, was a hostile work environment and a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* The defendant moves for summary judgment on the grounds that Bigalke was not an employee but an independent contractor (not protected by Title VII) who was hired for a specific and limited role in the company's information technology department. The company also asserts that even if she were an employee, the facts do not support a hostile work environment claim. For the reasons given herein, I agree with Neenah that Bigalke was an independent contractor; its motion for summary judgment will therefore be granted.

**I. Background**

Neenah Foundry, a manufacturer of castings, lids and grates, employs some 930 individuals. In November 2002 the company was about to implement a new database software program called InfinityQS, which the parties describe as a real-time data collection system. To help implement the program and train Neenah employees on its use, the company retained the services of Barbara Bigalke. Bigalke's name was known to the company because several months earlier, while she was employed at UW-Fox Valley, Bigalke had written to Neenah offering the university's services to help Neenah train its employees. "I have extensive experience in computer training," she wrote, "and have successfully worked with numerous local businesses, including Neenah Foundry. . . . I am confident that the UW-Fox Valley, Office of Continuing Education, can provide Neenah Foundry with the training and service that they expect and deserve." (Headington Aff., Ex. A.) The letter continued, "The focus of this approach is truly designed to allow a company to keep their employees and software applications supported while the demands and time constraints are relieved from your own staff."

At her interview with Neenah, however, the company told her it wanted to retain her individually rather than through the auspices of the UW-Fox Valley. Bigalke and Julie Vanden Acker, Neenah's information technology manager, agreed that Bigalke would be paid $50 per hour and would not receive any other benefits such as health insurance. She would be paid on a 1099 rather than being issued W-2's, and thus would be responsible for her own taxes. Other details about the nature of her services are set forth below.

Things generally went smoothly until March, when Bigalke began involvement in an affair with Timothy Dorn, who was one of the Neenah employees overseeing Bigalke's InfinityQS project.

Dorn's wife Debbie also worked at Neenah, a fact which altered the office dynamic significantly. Although many of the details are disputed, Bigalke alleges that the office became a hostile environment in which to work when Timothy Dorn pressured her to keep silent about the affair and other employees began spreading lies about her. Bigalke revealed the existence of the affair to Julie Vanden Acker on April 10, and Bigalke's services were terminated the next day by Dennis O'Brien, Neenah's vice president for human resources. Timothy Dorn was fired some five months later.

**II. Analysis**

Summary judgment is proper when there are no outstanding issues of material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The parties agree that Title VII does not apply to independent contractors, and the defendant's motion for summary judgment largely involves the question of whether Bigalke was a Neenah employee or an independent contractor. In order to guide courts in the determination of whether an individual is an employee or independent contractor, the Seventh Circuit has set forth a five-part test, which imports principles of agency law:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and work performance; (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace; (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace and maintenance of operations; (4) method and form of payment and benefits; and (5) length of the job commitment and/or expectations.

*Alexander v. Rush Northshore Medical Center,* 101 F.3d 487, 492 (7th Cir. 1996). Obviously, these factors are not to be applied in a rote or mechanical fashion; the point is to determine, in a practical and common sense way, whether the goals of Title VII would be met if applied to the individual and employer in question. And, as the Seventh Circuit has noted, the first factor–the employer's control

3

over the worker–is often the most important. *Knight v. United Farm Bureau Mut. Ins. Co.,* 950 F.2d 377, 378-79 (7th Cir. 1991). Indeed, several of the other factors, such as the method of payment and the length of the job commitment, can be viewed as specific indicia of the amount of control an employer exercises over the worker. I will now address each of the factors.

**1. Neenah's Control Over Bigalke**

Neenah characterizes Bigalke as a short-term consultant over whom the company exercised little control. In Neenah's view, she was retained not to perform general computer or information technology services, but to implement a specific program and train employees on it. That was, in fact, the gist of the letter she had sent Neenah prior to being retained. In that letter, Bigalke described her expertise in training and her willingness to work, under UW-Fox Valley's auspices, with local employers to help train their employees. Although the company retained her directly, rather than through UW-Fox Valley, Neenah states it believed it was simply hiring an outsider to help it with a particular project–that is, a relationship consistent with the services Bigalke originally offered in her letter. Further, when she signed on with Neenah, she largely controlled her own hours and worked only sporadically.

Bigalke disputes this characterization. Although it is unclear how it is relevant to the issue of Neenah's control over her, Bigalke's primary argument relies heavily on certain statements made by Dennis O'Brien, Neenah's vice president for human resources. He testified that Bigalke was an employee because "anybody that is working under our roof and that we are paying is an employee of Neenah Foundry Company." (PPFOF ¶ 85.) On other occasions, too, O'Brien characterized Bigalke as a Neenah employee. This shows, in the plaintiff's view, a clear pattern of treating her as an employee. O'Brien disputes this characterization of his statements. In his deposition, for

4

example, he asks rhetorically, "By saying the word employee, does that negate all of the things that it takes to be considered an employee for Neenah Foundry Company, the recruiting, the filling out of an application, the hiring, all of the things we offer an employee, and suddenly by using that word does that make that employee an employee employed by the company on our payroll, absolutely not." (Supp. Gill Aff. at 48.) In any event, regardless of how O'Brien's words are characterized, there is nothing within either the purposes of Title VII or the *Alexander* framework that would place any significant weight on the terminology a company's human resources staff uses to describe a person. Indeed, in the more common case, allowing employers' verbiage and *ipse dixit* to be outcome determinative would allow employers to evade Title VII entirely simply by using the term "independent contractor" when the individual is really an employee. *See Schwieger v. Farm Bureau Ins. Co.,* 207 F.3d 480, 483 (8th Cir.2000) ("an employer may not avoid Title VII by affixing a label to a person that does not capture the substance of the employment relationship.") (citations and internal quotation marks omitted). Thus, I do not give any substantial weight to the fact that O'Brien, on occasion, may have used the term "employee" to describe Bigalke.[1]

The plaintiff also states that Neenah exercised control over her work and her schedule. She claims, for example, that she worked a Monday-Wednesday-Friday schedule that was "dictated" to her by Timothy Dorn, who also monitored her work. In fact, the evidence establishes that Neenah exercised little control over Bigalke's activities or her schedule. First, there is no evidence that Dorn or anyone else ever "dictated" Bigalke's schedule to her at any time; the claim seems largely to be an invention of Bigalke's brief. In fact, her timesheets–which she submitted as invoices to the

---

[1] Other descriptive labels in the record could be used just as easily against Bigalke. For instance, in an email to Vanden Acker, she refers to herself as an "outsider" who has worked with many different manufacturers.

5

company–reveal what can only be described as an erratic and part-time work schedule. (Vanden Acker Aff., Ex. A.) In a typical week Bigalke worked only 8-14 hours for the company. Although in a few weeks she billed the company for as many as 24 or 32 hours, just as often she would work as few as 5 hours in a week. Some weeks she worked three days, but more often it was only two. Occasionally she worked 8 hours at a time, but more often she performed her work in shorter spurts of 3 to 5 hours. She also billed for segments as brief as 1 and 2 hours. By and large, hers was the schedule of an outside consultant, not an employee. When a worker typically only spends 2-3 days at the office, and then only for relatively short periods of time, it is difficult to conclude (absent other evidence) that an employer has much control over that individual. *Cf. Folkerson v. Circus Circus Enterprises, Inc.,* 1995 WL 608432, *4 (9th Cir. 1995) ("Folkerson had little discretion over when, how long, or where to work. She worked full-time from 10:00 a.m. to 6:00 p.m., six days per week. Full time employment is an indicia of an employee relationship.")

In addition, Bigalke's emails reveal that she possessed a substantial degree of control over her schedule and suggest she was more an outside consultant than an employee. She would occasionally email employees (from her personal email address) telling them which days she would be on-site. At one point, she emailed Julie Vanden Acker to tell her that her plans had changed: "I was planning to come in tomorrow but my hubby surprised me and is kidnapping me for our anniversary (which is tomorrow) and we are leaving late Thurs night". (Vanden Acker Aff., Ex. B at 4.) Notably, she does not ask anyone's permission for the time off, and gives almost no notice (less than one day) that she will be absent from the office. Her own work schedule at Neenah thus seems largely dependent on her own plans, which is far different from that of a traditional employee.

6

Other emails reveal Bigalke's own control over the InfinityQS project. In one, she states it would be beneficial to her to "understand the jargon of the plant" and interview employees so as to better implement the InfinityQS system and cater to the needs of those who would be using it. Importantly, she tells Vanden Acker that such background work is "not a charged item" on her part. *Id.* at 5-6.) This shows that Bigalke is not only directing the project herself, but that she has the discretion to decide which of her services she will bill Neenah for.

In sum, the relatively low number of hours worked and the erratic schedule suggest strongly that Bigalke was a part-time consultant engaged by the company to accomplish a particular project rather than a traditional employee. Her own correspondence corroborates the fact that her schedule was largely at her own discretion and that she maintained direction over the course of the project and control over which services she billed the company for. Accordingly, this factor–the most important–strongly favors a finding that Bigalke was not an employee of Neenah.

**2. Skills Involved and Employer Training**

The second factor involves "the kind of occupation and nature of skill required, including whether skills are obtained in the workplace." 101 F.3d at 492. "An individual's unique work skills may indicate independent contractor status. However, if the individual requires substantial training and supervision, an employee/employer status is more likely." *Worth v. Tyer,* 276 F.3d 249, 263 (7th Cir. 2001) (citation omitted). The reason underlying this factor, presumably, is that those with specialized skills are less likely to be permanent hires or additions to the company payroll. In contrast, if a company provides extensive on-the-job training for a worker, that could evidence the company's long-term commitment to employ that person.

7

Bigalke cites the fact that Neenah sent her to two educational training seminars at company expense. This shows, she believes, that on-the-job training was provided. It is unclear, however, how this limited training makes her an employee rather than an independent contractor. Paying for a few training sessions says nothing about the nature of the work involved, nor does it indicate that Bigalke's skills were obtained while at the company. *See Hojnacki v. Klein-Acosta,* 285 F.3d 544, 550 (7th Cir. 2002) ("Dr. Hojnacki did not derive her medical skills from her employment with the DOC.") All the evidence shows is that Bigalke was retained as a software consultant with significant expertise in software training, which is, in fact, how she advertised herself to the company in the first place. (Headington Aff., Ex. A.) Because it is clear that she brought significant specialized experience to the table, this factor tends to demonstrate her status as an independent contractor rather than an employee. *See Salamon v. Our Lady of Victory Hosp.,* 2006 WL 625839, *8 (W.D.N.Y. 2006)("As to the second factor, plaintiff is clearly a very skilled professional, which favors a finding of non-employee.")

In addition, the very nature of her work strongly suggests independent contractor status. She was hired, by her own admission, to assist in the implementation and training on a brand new software system. Because the implementation of a specific software system is not a permanent, ongoing event, it would not make sense for a company to hire a permanent worker to train employees on a new software system (see Section 5, *infra*). Accordingly, the second factor strongly favors a finding that Bigalke was not an employee.

**3. Workplace Costs and Equipment**

The third factor involves "responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace and maintenance of operations," *Alexander,* 101 F.3d at 492, and

8

clearly favors the plaintiff. Bigalke notes that she worked on company premises, was given a laptop computer and desk, had a computer password, parked in the employee lot, and was otherwise treated the same as company employees.

Yet the physical accouterments of employment, such as a password, computer and desk, are not particularly remarkable. Indeed, one expects that even unpaid interns would have access to most of the facilities the plaintiff cites. And given the fact that her work involved computer software, it is hardly surprising that she would be expected to work on-site in an office setting and have computer access. Accordingly, while this factor favors the plaintiff, the various trappings of employment she cites seem more superficial than substantive indicia of employment status.

**4. Method and Form of Payment and Benefits**

The defendant relies heavily on the fact that it did not pay Bigalke as a standard employee and did not withhold taxes as it typically would for an employee, which are factors the Seventh Circuit has cited as important. *See Taylor v. ADS, Inc.,* 327 F.3d 579, 581 (7th Cir. 2003). Indeed, tax withholding is not simply a matter of bookkeeping, but evidences instead both the employer's longer-term commitment to employing the individual–to process her annual tax obligation–as well as the employer's control over the employee's paycheck. *Lerohl v. Friends of Minnesota Sinfonia,* 322 F.3d 486, 492 (8th Cir. 2003) ("It is also highly significant that the Sinfonia withheld no income or FICA taxes, documented musician payments on an IRS Form 1099, and provided no employee benefits other than contributions to an independent union pension fund.") According to the Internal Revenue Service,

> The Form W-2 is used by employers to report wages, tips and other compensation paid to an employee. The form also reports the employee's income tax and Social Security taxes withheld and any advanced earned income credit payments. The Form

9

> W-2 is provided by the employer to the employee and the Social Security Administration. A Form 1099-MISC is used to report payments made in the course of a trade or business to another person or business who is not an employee.

(http://www.irs.gov/faqs/faq12-2.html.)

Thus, by submitting billing sheets to Neenah and taking responsibility for her own taxes, Bigalke established much more control over her income than a typical employee would possess. In addition, as noted earlier, she maintained the discretion to determine for which services Neenah would be billed. Accordingly, the method of payment strongly suggests that Bigalke was an independent contractor rather than a company employee.

Additionally, it is noteworthy that Bigalke received no employment benefits apart from her hourly pay. The receipt of benefits such as health insurance, which is almost *de rigeur* for skilled employees in today's workforce, can add another level of interdependence between employer and employee. Indeed, when the employee's health insurance is dependent upon her employment status, the employer's degree of control over the employee can be greatly magnified. Here, the absence of that aspect of the traditional employment relationship suggests that Neenah's control over Bigalke was much less than it would be had she been dependent on the company for benefits.

**5. Length of Job**

A worker's length of service is another factor that can evidence the degree of control the employer maintains over the worker. Neenah states that it hired Bigalke for a specific purpose–to implement and train employees on the InfinityQS program–and that her services would not be required after that was finished. Although there is no indication as to how long Neenah expected the project to last, there is no evidence that the project was to be permanent.

10

Bigalke disputes the notion that she was hired merely to implement and train employees on the InfinityQS program. In her view, she was hired to implement *and* maintain the program, which apparently would have required long-term and substantial services beyond the system's implementation. This assertion appears to be another invention of the plaintiff's brief, however. There is no evidence in the record that anyone expected that Bigalke would stay at the company for an extended period of time. Instead, every indication is that she was hired to accomplish a specific project–which is the bread and butter of consultants and independent contractors–after which her services would no longer be required.

Bigalke's own statements make this crystal clear. In a lengthy April 13 email to Dennis O'Brien, she set forth a series of complaints about her work environment (which constitute the basis of her hostile work environment claim). Despite those complaints, she expressed confidence that she could survive to finish the project:

> Per our phone conversation on April 11, 2003, you stated that my work was good, you heard good things about my work, there is opportunity to use my services in the future, but on this project my services were no longer needed due to personal issues. *I have been extremely committed to this project despite the work conditions described above and had full intentions to carry this project to completion. This project is so close to being completed and I feel I can complete this project*. I have earned the trust and respect from the people who will use the Infinity system the most. This would be the most cost efficient and least disruptive for Neenah Foundry. The remainder of this project does not have to involve Timothy Dorn. *The remainder of the project is the writing of training materials which can be done off hours and the training of the staff. Training is my specialty as a teacher at the local colleges*.

(O'Brien Aff., Ex. C) (italics added). The only reasonable way to construe the above paragraph is that both O'Brien and Bigalke viewed her role as that of an outside consultant who had been hired to complete a particular project and nothing more. Indeed, the project is "so close to being

11

completed" that she wanted to finish. There was thus no expectation on either end that the project involved any long-term services at all: to the contrary, all that remained, in Bigalke's own words, was to draft training materials and to train employees. she herself recognized the time-limited role for which she was hired. Her email was not the plea of an employee asking for her job back, it was that of an independent contractor asking to be allowed to finish up a nearly-completed project.

**6. Summary**

In sum, only one of the five factors leans Bigalke's way–the third–and that factor is of little weight under these circumstances. The other factors tilt strongly in favor of Neenah. What the evidence shows is that Bigalke was retained because of her special skills in computer training, and that she herself had solicited the company offering those skills on a consulting basis. She was hired to perform a specific task, and her role was limited in both scope and time. During her time with Neenah, Bigalke worked a limited and erratic schedule, often logging fewer than ten hours per week. She billed the company herself, rather than receiving a paycheck, and the company did not withhold any taxes from her checks. It was understood by all involved that when the project was completed, Bigalke would not remain with the company. Because these facts are all hallmarks of a classic independent contractor relationship, and because there is no evidence in the record to the contrary, summary judgment is appropriately granted to Neenah.

Therefore, **IT IS ORDERED** that the defendant's motion for summary judgment is **GRANTED**, and the case is **DISMISSED**.

Dated this 9th day of June, 2006.

                                                                                  s/ William C. Griesbach
                                                                                   William C. Griesbach
                                                                                   United States District Judge